## Board of Education of Louisville, Ky. v. Brumleve, et al.

(Decided December 6, 1918.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Second Division).

Adverse Possession—Schools and School Districts—Adverse Holding by Public School Authorities—Question for Jury—Evidence.—In an action by the trustees, under a deed conveying property in trust for a neighborhood school and other purposes, to recover a school house and lot held by a city board of education under a claim of adverse possession, evidence examined and held to make the question of adverse possession one for the jury.

ARTHUR M. RUTLEDGE for appellant.

GIBSON & CRAWFORD, W. W. CRAWFORD and J. JOS. HETTINGER for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

Ben J. Brumleve, J. Crow Taylor and J. C. Calloway, as trustees, brought this suit in ejectment against the Board of Education of Louisville, to recover a house and lot located on the south side of Broadway, between 39th and 40th streets, in the city of Louisville. At the conclusion of the evidence, the court directed a verdict in favor of plaintiffs. Judgment was entered accordingly and the defendant appeals.

It appears that prior to the year 1864, the people of the neighborhood raised sufficient money to build a

house on the lot in question, and on February 10th of that year John J. Gaar and his wife, in consideration of $75.00, cash in hand paid, conveyed the lot to N. H. Gaar, Joseph Gaar and Henry Jansing, as trustees, for the following purposes:

"First: That they will hold said property hereby conveyed and the improvements thereon for the perpetual use of the neighborhood school to be conducted therein and not to be interfered with or molested by other use or for any other purpose whatever.

"Second: When said property is not in actual present use for school purposes then for the use of the neighborhood debating and literary society which has the right to keep its library and archives therein and to meet for debates and other purposes so as not to interfere with school hours.

"Third: When said premises are not in use for school purposes or by the said society, then it may be used as a place of public worship or for religious exercises, by any denomination of Christians, but not to be monopolized or claimed by any one denomination and if any contest should arise between different denominations then said trustees shall regulate and divide the use thereof as shall to them seem equitable and fair, but never to molest the school or said society.

"Fourth: In case of the death of either of said trustees, the survivors to hold the title for the same uses and with power to them with the consent of those who contributed to said building to name and appoint a successor or successors."

How long a purely neighborhood school was conducted in the property does not appear, but soon after the execution of the deed, the county school superintendent and the trustees of the district in which the property was located took possession of the school, and conducted it as a common school until the year 1913, when it was turned over to the Board of Education of the city of Louisville. In the meantime the original trustees had died without exercising their power of appointment. In the year 1915, Brumleve, Taylor and Calloway were appointed trustees under the deed, by a judgment of the Second Division, Chancery Branch, of the Jefferson circuit court.

The only question presented is, was there sufficient evidence of adverse possession to authorize the submission of that question to the jury?

For the defendant, Samuel D. Jones, its business director, testified that the Board of Education assumed control of the property in 1913. After that time, the board spent from $100.00 to $150.00 in repairs and improvements, and openly claimed, used and managed the property as its own. Prior to that time, however, he knew nothing about the property, nor did he include it in his insurance list. He knew nothing about the title, as this was a matter he wasn't called upon to investigate. Mrs. Stonestreet, who was county school superintendent from 1898 to 1910, testified that during that time the school was managed and controlled by her and the trustees elected for that district, and was always regarded as a public school. The money received from the state was applied to the payment of a teacher elected by the trustees and frequently there was a tax voted by the people of that district for the maintenance of the school for a longer term. Furthermore, she reported this property as part of the public school property to the State Superintendent. Repairs on the school were paid by the trustees and the teachers. If the tax voted by the people was not sufficient for the purpose, the balance was made up by voluntary contributions and by the proceeds of entertainments. On cross-examination she was asked if she claimed the title to the real property. She answered, "I didn't claim title to anything." In answer to the question, "You never made any claim to the property at all, did you?" she answered, "Of course I made claim to it." L. J. Stivers, who served as county superintendent from 1884 to 1894, testified that the property in question was used during that time as a public school just like the property of other districts. The school was regularly visited by him and was under the jurisdiction of the three district trustees, and was conducted as a regular public school. During that time he claimed it as public school property and it went by the name of "District School, No. 35." He further stated, however, that he didn't make any attempt to claim anything about the title as he didn't know anything about that, but it was public school property. Henry B. Manly, secretary of the Board of Education, stated that the board had had charge and control of the property since 1913, and had treated it as other public school property of the city. Prior to that time he had known it as a county school. Alfred H. Hite, who was county superintendent from

1894 to 1898, testified that the property was used during that time as a county school. It was regularly visited by him and the teachers were paid out of the public school fund. It was also claimed by the trustees as public school property. On cross-examination he stated that he didn't know whether there was any title to the county in this property or not and couldn't say that he had ever heard anybody claiming that there was any. He never heard anybody claim, at any time, that this property belonged to the county. However, he never heard any claim that it belonged to anybody else. George J. Hommel, who had known the property for about fifty years and who was a school trustee during the years 1893 and 1894, testified that when he first knew the property it was a country school, a neighborhood school, but that it was not a public school. However, he may have said that it was run as a common school. He further stated that the property was owned by the neighborhood and nobody else. Orville Stivers, who became county school superintendent, January 1, 1910, testified that the property in question was used during his administration as public school property. The teachers were public school teachers and were paid out of public funds. During that time the school was never in use as a private school. Didn't know who really owned it, but the school board assumed that it was part of their property. During his administration money was spent in repairing the building. In the year 1913 the property passed out of his hands and was turned over to the Board of Education of the city.

For the plaintiffs, Henry Dubourg testified that he hauled the brick for the school and that the school was built for the neighborhood. The property was owned by John Gaar, and after it was deeded to the trustees it belonged to the neighborhood. He never heard of the property being claimed by anyone but the neighborhood. He further stated that the county took charge of the property and paid the teachers, but did not remember when that occurred. Lena Kurkamp testified that she taught the school from 1900 to 1914. She was appointed teacher by the trustees and was under Mrs. Stonestreet. For six months of the year her salary was paid by the state. For the rest of the time she made up the money by candy pullings, socials and subscriptions from the people of the neighborhood. She also secured money from the residents of the neighborhood to pay water

bills, coal bills, etc. On cross-examination she stated
that she reported to Mrs. Stonestreet. The people of
the neighborhood contributed for the purpose of keep-
ing the school in session longer than six months. It
was optional with her whether she would conduct the
school after the six months elapsed, but even during the
latter period she reported to the county superintendent.
After the year 1908, she was paid for eight or nine
months out of the public fund. Orville Stivers, on be-
ing recalled, produced the minutes of the County Board
of Education, turning over the property to the Board
of Education of the city of Louisville. Henry F. Gaar,
who had known the property in question ever since he
was six years of age, testified that the school house
was built by the citizens of the neighborhood. During
that time he never heard of any claim of ownership by
Jefferson county or the Louisville School Board ad-
verse to the claim of the neighborhood under the Gaar
deed. He further stated that from the time public
schools were begun, the school was conducted as a pub-
lic school and was under the control of the public
school trustees. He and the citizens supplemented the
salary of the teacher when the public school fund was
exhausted. John L. Heck testified that he was a trustee
six or seven years from 1885 on. During that time he
recognized the title as being in the neighbors. On
cross-examination he testified that he operated the
school as a public school and as a part of the public
school system. Prior to that time, it had also been oper-
ated as a public school. John Heck, on being called in
rebuttal, testified that he guessed the county claimed to
own the property. All he knew was that the county kept
the school there and claimed it as a county school. He
didn't know where the title was.

In giving the peremptory, the trial court proceeded
on the theory that, although the property was used ex-
clusively as a public school, such use was consistent with
the purposes for which the property was conveyed, and
was therefore not adverse. With this conclusion we are
not prepared to agree. It seems to us that there is a
broad distinction between a neighborhood school con-
trolled by the neighborhood as mere individuals, and
supported solely by voluntary contributions, and a pub-
lic school supported by taxation and controlled and
managed by the public school authorities, under the pub-
lic school laws of the state. Fairly construed, the evi-

dence for the defendant tends to show an abandonment of the purposes for which the property was originally conveyed, and its possession, control and use for entirely different purposes. Thus it appears from the defendant's testimony, that for more than thirty years the property was used, controlled and possessed by the public school authorities as a common school. The teachers were paid out of the common school fund, just as other district teachers were paid. The property was not only claimed as public school property, but was reported to the State Superintendent as public school property. While it may be true that in some instances the teachers, after the regular common school term, raised the money for the extension of the term by public entertainments and private subscriptions, this was a method usually employed at that time for the extension of the common school term and cannot be regarded as conclusive evidence of the presumption of control and possession by the people in the neighborhood. Indeed, the acts of control and possession, proven by the witnesses for the defendant, were such as to apprise the people of the neighborhood that the school being conducted in the property was not a neighborhood school, but a public school operated as a part of the public school system of the state. We, therefore, conclude that the evidence of adverse possession was such that reasonable men might draw different conclusions therefrom, and that therefore the question should have been submitted to the jury.

Judgment reversed and cause remanded for new trial consistent with this opinion.